[Civ. No. 1923. Fourth Appellate District.—August 7, 1936.]

ERNEST A. KEYSER, Respondent, v. SAN DIEGO ELECTRIC RAILWAY COMPANY (a Corporation) et al., Appellants.

Morrison, Hohfeld, Foerster, Shuman & Clark and V. F. Bennett for Appellants.

Stearns, Luce & Forward, Stearns, Luce, Forward & Swing and Russell H. Pray for Respondent.

BARNARD, P. J.—The plaintiff was injured by a street car owned by the corporate defendant and operated by the individual defendant. A verdict for $35,000 was reduced to $15,000 in connection with a motion for a new trial, and the defendants have appealed from the judgment.

The accident happened about midnight on April 8, 1934, in front of the Santa Fe depot in San Diego. Just south of this depot, which is on the north side of Broadway, the street car track makes a loop enabling cars which have come west on Broadway to return east along the same street. In entering this loop a west-bound car swings to the north and passes along the south end of the depot over what is really the station platform, the north rail of the track being about 10 feet from the south end of the depot, and the south rail being about 25 feet north of the north curb of Broadway. The street cars regularly stop opposite the southwest side of this depot with the car partly turned to round the loop. No one saw this accident happen, but immediately thereafter the respondent was found lying south of the depot and near the north rail of the track. His arm had apparently extended over the north rail of the track and had been run over by the rear wheels of the car, his injuries being such that his arm had to be amputated between the elbow and shoulder.

The respondent testified that he was standing near the southeast corner of the depot; that two street cars were already there, one standing at the regular stopping place, partly around the loop, and the other ''on the straightaway behind it''; that the rear end of this second car was half a car length away from him; that a third car came up and stopped ''right at the rear'' of the second car with its front end some 15 feet west of where he was standing; that when this third car stopped its doors and steps were opened and lowered; that he started over to board that car; that just as he stepped on it the first two cars pulled out and the third car started up with a jerk which threw him to the ground; that when it started he had his foot on the step and his hand on the handhold; that he was thrown on his face; and that the next thing he knew his arm was run over.

It is appellant's theory that the doors and steps of the car in question were not opened and lowered until the car arrived at the regular stopping place opposite the west end of the depot, that the respondent was running alongside the car and parallel to it, and that when he was about halfway between the two ends of the moving car he slipped and fell, his arm going over the north rail where it was run over by the rear wheels of the car.

There is some corroboration of the respondent's testimony to the effect that the car in question stopped behind two other cars, that. its doors and steps were then opened and lowered, and that it pulled up to the regular stopping place after the other cars moved on. However, no one saw the respondent fall and the question as to which theory of the cause of the accident is correct must depend upon whether his testimony on the trial is accepted, or whether certain prior statements alleged to have been made by him are to be taken as establishing what actually occurred.

The main ground of appeal is that the evidence is not sufficient to support the verdict. While it is conceded that the respondent's testimony, if believed, is sufficient for this purpose, it is earnestly contended that because of certain written and oral statements made by him shortly after the accident occurred, his testimony at the trial is so inherently improbable and unbelievable that it could not be accepted as true by rational and unprejudiced minds and that, for this reason, it created no conflict in the evidence. The appellants rely upon *Branson* v. *Caruthers,* 49 Cal. 374, *Guerrero* v. *Ballerino,* 48 Cal. 118, *Lind* v. *Closs,* 88 Cal. 6 [25 Pac. 972], *Franklin* v. *Dorland,* 28 Cal. 175 [87 Am. Dec. 111], *Carpentier* v. *Gardiner,* 29 Cal. 160, *Field* v. *Shorb,* 99 Cal. 661 [34 Pac. 504], *Houghton* v. *Loma Prieta Lumber Co.,* 152 Cal. 574 [93 Pac. 377], and *Byrne* v. *Knight,* 12 Cal. App. 56 [106 Pac. 593]. ▮ While it was held in some of these cases that certain testimony was not to be believed because other facts had been established, we are confronted here with a somewhat different situation. Assuming that the respondent made the prior statements relied upon by the appellants, the problem remains as to which of his statements is true. There are no other established facts which disclose the answer to this problem. There is nothing inherently improbable or unbelievable in either story in itself. While a reading of the record leaves some doubt in our minds concerning the story told by the respondent on the witness stand, it must be conceded that the jurors and the trial judge had advantages in attempting to discover the truth of the matter which are not afforded to us by the written record. The usual rule is that the jury may believe a part of a witness' testimony and disbelieve other parts. Usually this rule must apply to any discrepancies between

his testimony on the stand and other statements he may have made, unless it clearly appears that he is not to be believed at all. It has recently been held . that a conflict between the testimony of a witness and statements he had previously made in a deposition presented a question of fact for the jury. (*Miller* v. *Schimming*, 129 Cal. App. 171 [18 Pac. (2d) 357] ; *Smarda* v. *Fruit Growers Supply Co.*, 1 Cal. App. (2d) 265 [36 Pac. (2d) 701].) A further consideration in the instant case is that certain evidence was received which at least throws some doubt upon and around the prior statements relied upon by the appellants.

The evidence relating to such prior statements need be only briefly reviewed. The motorman and two passengers on the street car in question testified that shortly after the accident and while the respondent was lying on the ground he was asked how the accident happened and that he replied that he "slipped and fell" or that he "was running and slipped". One of these witnesses had given a written statement to the appellants in which he stated that he had heard no statement by the injured man as to the cause of the accident. This witness had also told another witness that he had heard no statement of that kind from the injured man. Two other witnesses, one of whom was the first to reach the injured man, testified that they heard no such statement made.

The policeman who accompanied the respondent to the hospital in an ambulance testified: "I asked him what had happened. He said he was running for the street car and slipped and fell. I asked him if he was running in the same direction that the street car was going; and he said 'yes'." However, this officer in his report of the accident, made within an hour after it happened, set forth as the cause of injury: "Attempted to jump on street car; fell from steps." This officer testified that he made this report after twice asking the respondent how the accident occurred.

One doctor testified that the next morning at the hospital he asked the respondent how he was injured and that "he told me the night before, approximately at midnight, he was running alongside a street car in an attempt to board it and that his foot slipped and his arm fell under the car and the last two wheels of the car passed over it, crushing it". Another doctor testified that on the same morning

he asked the respondent the same question and his statement as to what the respondent told him corresponds very closely to respondent's testimony on the stand.

It may be observed in connection with all of these oral statements, assuming them to have been accurately reported by the witness, that the street car track is so close to the depot that the respondent, if he went directly from where he says he was standing to the street car steps, would have been going in the same direction as the street car was traveling, although at an angle, and his statement that he was running and slipped or that he slipped and fell could have referred to what occurred at the car steps. In view of the evidence as to his suffering and condition at the time these statements were supposed to have been made, with the conflicting evidence with respect to certain of them, the jury could have drawn the inference that the statements were not accurately reported, that the respondent was confused by his suffering and had not attempted to make a full and complete statement, or that any such statements were not necessarily so conflicting with his testimony on the stand as to render the latter unbelievable.

The respondent's arm was amputated on April 11th and on April 14th a representative of the appellant company went to the hospital with a typewriter and, after asking the respondent questions, wrote up a statement which respondent signed after initialing a number of corrections. This statement is quite long, taking up six and one-half pages of the transcript. The first half consists of answers to more or less general questions, and the last half purports to be a narrative in detail of what occurred on the evening of the accident. This includes the statement that while he stood near the corner of the depot this street car stopped with its doors open, that he started to go out and get on it, that the two street cars ahead moved away and this car started ahead, that he thought it would not make a second stop and continued running, that when he had taken two or three quick steps his ankle turned, that when he arrived about halfway between the two ends of the street car he fell, and that his left arm must have gone across the first rail of the tracks. This statement closed with a declaration that he did not blame anyone for the accident. This was stricken out and a statement was added that he

did blame the "street car" for the accident. The claim agent testified that this change was made at the request of the respondent. The appellants argue that since the respondent correctly answered the questions in the first half of the statement, the remainder must be taken to be a correct account of how the accident occurred, and that this conclusively shows that respondent's testimony on the witness stand could not be believed.

While this statement is favorable to appellants' contention as to how the accident occurred a number of things tend to affect its conclusiveness. The statement was not written by respondent and the language therein is that of the claim agent. Private reports made by this agent to the appellant company were introduced in evidence. The most charitable thing to say is that these disclose that the manner in which the statement was obtained throws some doubt on its value. While the respondent admitted his signature to the statement he testified that he did not remember giving any such information to the claim agent and did not remember signing the statement. There was considerable evidence as to his mental condition on April 14th, which would furnish some justification to the jury for refusing to accept the statement at its face value. The respondent's wife and mother-in-law came into the room while the claim agent was still there and his wife testified that the respondent was then irrational, and that he called her "nurse" and "mother". The mother-in-law testified that as soon as the claim agent went out of the room she tried to talk with the respondent but found him drowsy and confused. The physician in charge of the hospital testified with reference to the respondent's mental condition that day: "I think—as I stated before, he could answer a question. I could go in and rouse him and he would answer questions all right. I probably wouldn't be in his room over two or three minutes at a time. But any prolonged examination, I doubt if he was able to answer, to continue that examination, answer correctly over a long period of time." "I say over a short period of time he was rational. If one questioned him for a period of an hour or so, I wouldn't want to rely on his questions, because I don't think he could command his intellect for any long period of time. He had to sort of pull himself together over a short period of

time.'' He further testified that ''The toxemia from his gas bacillus infection was still present'' and that this would decidedly affect his mental condition.

The inferences the appellants would draw from the oral statements are not the only inferences that can be drawn therefrom. Considerable doubt was cast upon the written statement by some of the evidence. We are unable to tell with any certainty, from a reading of the record, which theory as to how this accident occurred conforms to the truth. We can hardly say that no reasonable man could have believed the respondent's testimony, under the circumstances and when twelve jurors and the trial judge, with a better opportunity to appraise the same, have accepted it. We are forced to the conclusion that the question of whether the respondent's testimony was to be believed was one for the jury, that this testimony cannot be disregarded by this court as being so incredible and palpably false as to constitute no evidence at all, and that no more here appears than a conflict in the evidence.

 The only other point raised is that the court committed error in unduly restricting the cross-examination of the respondent. Some eighteen instances are set forth and while it is conceded that most of these refer to immaterial matters it is argued that, in such a case as this, the question of the veracity of the respondent was of the greatest importance and that the appellants should have been permitted the widest latitude in its efforts to convince the jury that the respondent was untrustworthy as a witness. We have carefully read the record and the cross-examination of the respondent covers eighty-six pages of the transcript. The rulings of the court in each instance referred to were technically correct, most of the matters were trivial, and we are unable to see how any of them, if permitted to be further developed, could possibly have affected the result. The court was extremely liberal with respect to this cross-examination and could well have drawn the lines much closer. None of the matters referred to is sufficient to indicate any abuse of discretion on the part of the court.

The judgment is affirmed.

Jennings, J., and Turrentine, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 4, 1936, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 28, 1936.