[No. 51908-1. En Banc. October 30, 1986.]

CERTIFICATION FROM THE
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
IN
NANCY LOUISE TYSON, *Plaintiff,* v. DWIGHT
ROBERT TYSON, *Defendant.*

*Sindell & Levy, Inc., P.S.,* by *Barbara Jo Levy,* for plaintiff.

*Carney, Stephenson, Badley, Smith, Mueller & Spellman, P.S.,* by *Sylvia Luppert,* for defendant.

*J. Kathleen Learned* and *Melanie J. Rowland* on behalf of Northwest Women's Law Center, amici curiae for plaintiff.

*Bertha B. Fitzer* on behalf of Washington Association of Defense Counsel, amicus curiae for defendant.

DURHAM, J.—The United States District Court for the Western District of Washington has certified the following question of state law to this court: Does the discovery rule, which tolls the statute of limitations until the plaintiff discovers or reasonably should have discovered a cause of

action, apply to intentional torts where the victim has blocked the incident from her conscious memory during the entire time of the statute of limitations? We answer the question in the negative.

The plaintiff here alleges that she was the victim of sexual abuse during her childhood. The parties have stipulated to the following facts: Plaintiff Nancy Tyson filed a complaint in the United States District Court for the Western District of Washington on August 26, 1983, alleging that her father, the defendant Dwight Robert Tyson, committed multiple acts of sexual assault upon her from 1960 through 1969. Plaintiff, whose birthdate is April 20, 1957, was between 3 and 11 years old at the time of the alleged acts, and was 26 years old at the time she filed the complaint.[1] Plaintiff further alleged that the sexual assaults caused her to suppress any memory of the acts and that she did not remember the alleged acts until she entered psychological therapy during 1983. Plaintiff filed the complaint within 1 year of her recollection of the alleged acts.

Defendant has moved for summary judgment of dismissal in the federal court contending that, as a matter of law, plaintiff's claim is barred by the statutes of limitation in RCW 4.16.080 and 4.16.100.

We begin our analysis with a review of the statutes of limitation applicable to this action. RCW 4.16.080(2) provides that, in general, an action for personal injury must be brought within 3 years of the time the cause of action accrued. RCW 4.16.100(1) provides that an action for assault and battery must be brought within 2 years. If the person bringing the action is under the age of 18 years at the time the cause of action accrues, the statute of limitations is tolled until the person becomes 18 years old. RCW

---

[1] There is a discrepancy between the stipulation of facts and the complaint regarding the dates of the alleged acts. The stipulation states that the acts occurred through 1969, while the complaint alleges they happened through 1968. Assuming the stipulation correctly states that plaintiff was between the ages of 3 and 11 at the time of the alleged acts, it appears they would have occurred through 1968, since she turned 12 years old in 1969.

4.16.190. Under a literal reading of the limitation statutes, the cause of action accrues when the alleged wrongful act occurs. *Ruth v. Dight,* 75 Wn.2d 660, 665, 453 P.2d 631 (1969). Under these rules, the limitation period in this case expired at the latest on April 20, 1978, or 3 years after plaintiff's 18th birthday. Because plaintiff brought her action more than 8 years after her 18th birthday, her action would ordinarily be barred by the applicable statutes of limitation.

Plaintiff contends, however, that the discovery rule should apply to her complaint. The discovery rule provides that a statute of limitations does not begin to run until the plaintiff, using reasonable diligence, would have discovered the cause of action. *U.S. Oil & Ref. Co. v. Department of Ecology,* 96 Wn.2d 85, 92, 633 P.2d 1329 (1981).

Plaintiff claims that the alleged acts of sexual abuse caused her such emotional trauma that she repressed her memory of the events entirely. She asserts that years after the statute of limitations had expired, therapy triggered her knowledge of the abuse and her recognition that the abuse caused emotional problems she was experiencing as an adult. Plaintiff argues that it would be unfair to preclude her claim because she was unable to discover her cause of action during the applicable limitation period.

We recognize that child sexual abuse has devastating impacts on the victim. However, when a person claims emotional injuries resulting from an intentional tort which she has allegedly remembered only after the statute of limitations has expired, we must seriously consider the potential effects on our system of justice.

Statutes of limitation assist the courts in their pursuit of truth by barring stale claims. A number of evidentiary problems arise from stale claims. *See generally Ruth,* at 664–65. *See also* Note, *Statutes of Limitations and the Discovery Rule in Latent Injury Claims: An Exception or the Law?,* 43 U. Pitt. L. Rev. 501, 512–14 (1982). As time passes, evidence becomes less available. For example, the defendant might have had a critical alibi witness, only to

find that the witness has died or cannot be located by the time the action is brought. Likewise, witnesses who observed the plaintiff's behavior shortly after the alleged act may no longer be available. Physical evidence is also more likely to be lost when a claim is stale, either because it has been misplaced, or because its significance was not comprehended at the time of the alleged wrong. In addition, the evidence which is available becomes less trustworthy as witnesses' memories fade or are colored by intervening events and experiences. Old claims also are more likely to be spurious than new ones. "With the passing of time, minor grievances may fade away, but they may grow to outlandish proportions, too." *Ruth,* at 665. Thus, stale claims present major evidentiary problems which can seriously undermine the courts' ability to determine the facts. By precluding stale claims, statutes of limitation increase the likelihood that courts will resolve factual issues fairly and accurately.

The discovery rule should be adopted only when the risk of stale claims is outweighed by the unfairness of precluding justified causes of action. *U.S. Oil,* at 93. In prior cases where we have applied the discovery rule, there was objective, verifiable evidence of the original wrongful act and the resulting physical injury. This increased the possibility that the fact finder would be able to determine the truth despite the passage of time, and thus diminished the danger of stale claims. For example, in *Ruth v. Dight, supra,* we adopted the discovery rule for a medical malpractice action arising from the presence of a foreign substance left inadvertently in a surgical wound. A hysterectomy was performed on the plaintiff in 1944. For a 22–year period following the surgery, plaintiff suffered recurrent abdominal pain. In 1966, plaintiff underwent an exploratory operation during which a sponge was found in her abdomen. After the sponge was removed, her recovery was normal. *Ruth,* at 662–63. Thus, there was empirical evidence of the occurrence of the alleged act (the initial surgery) and of the resulting harm (discovery of the

sponge). In *Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 598 P.2d 1358 (1979), we applied the discovery rule to a products liability action against an incubator manufacturer for blindness due to excessive administration of oxygen to the plaintiff when she was a premature infant. There was evidence that plaintiff was placed in an incubator for about 16 days and given oxygen. Her blindness was an objective manifestation of the resulting injury. *Ohler,* at 508–09. Again, empirical evidence existed of the alleged event and resulting harm. We have also applied the discovery rule to a products liability action for personal injuries resulting from asbestos exposure. *Sahlie v. Johns–Manville Sales Corp.,* 99 Wn.2d 550, 663 P.2d 473 (1983). There was evidence that the plaintiff had worked around asbestos products for almost 40 years, and he was eventually diagnosed as having asbestosis. *Sahlie,* at 551. The source of plaintiff's injury, continuous exposure to asbestos products, and the resulting harm, asbestosis, were objectively verifiable.

Because of the availability and trustworthiness of objective, verifiable evidence in the above cases, the claims were neither speculative nor incapable of proof. Since the evidentiary problems which the statute of limitations is designed to prevent did not exist or were reduced, it was reasonable to extend the period for bringing the actions.

Plaintiff suggests that her claim is identical to the above cases, noting that in those cases, the plaintiffs could not have known of the cause of action until an outside event or a professional's assistance triggered such knowledge. However, in each of the above cases, objective evidence, often accompanied by medical diagnosis, led to the plaintiff's discovery of the wrongful act. In contrast, in the present case, no empirical, verifiable evidence exists of the occurrences and resulting harm which plaintiff alleges. Her claim rests on a subjective assertion that wrongful acts occurred and that injuries resulted. There is no objective manifestation of these allegations. Rather, they are based on plaintiff's alleged recollection of a memory long buried in the unconscious which she asserts was triggered by psychologi-

cal therapy.

It is suggested that the subjectivity of plaintiff's claim can be eliminated at trial through the testimony of witnesses such as family, friends, schoolteachers and treating psychologists. However, none of this testimony would provide objective evidence that the alleged acts occurred. First, witnesses who knew the plaintiff at the time of the alleged events would be testifying from their memories of her emotional condition and behavior during that period. This would require witnesses to attempt to recall events which occurred between 17 and 26 years ago. Witnesses' recollections of memories usually become less reliable in a matter of minutes, much less years. Thus, the more time had passed, the less trustworthy such testimony would be.

Second, the testimony of treating psychologists or psychiatrists would not reduce, much less eliminate, the subjectivity of plaintiff's claim. Psychology and psychiatry are imprecise disciplines. Unlike the biological sciences, their methods of investigation are primarily subjective and most of their findings are not based on physically observable evidence. The fact that plaintiff asserts she discovered the wrongful acts through psychological therapy does not validate their occurrence. Recent studies by certain psychoanalysts have questioned the assumption that the analyst has any special ability to help the subject ascertain the historical truth. *See generally* Wesson, *Historical Truth, Narrative Truth, and Expert Testimony,* 60 Wash. L. Rev. 331 (1985). These studies show that the psychoanalytic process can even lead to a distortion of the truth of events in the subject's past life. The analyst's reactions and interpretations may influence the subject's memories or statements about them. The analyst's interpretations of the subject's statements may also be altered by the analyst's own predisposition, expectations, and intention to use them to explain the subject's problems. Wesson, 60 Wash. L. Rev. at 334–37, 349–50. Thus,

> the distance between historical truth and psychoanalytic "truth" is quite a gulf. From what "really happened" to

> what the subject or patient remembers is one transformation; from what he remembers to what he articulates is another; from what he says to what the analyst hears is another; and from what the analyst hears to what she concludes is still another.

Wesson, 60 Wash. L. Rev. at 338. While psychoanalysis is certainly of great assistance in treating an individual's emotional problems, the trier of fact in legal proceedings cannot assume that it will produce an accurate account of events in the individual's past.

The purpose of emotional therapy is not the determination of historical facts, but the contemporary treatment and cure of the patient. We cannot expect these professions to answer questions which they are not intended to address.

It is proper to apply the discovery rule in cases where the objective nature of the evidence makes it substantially certain that the facts can be fairly determined even though considerable time has passed since the alleged events occurred. Such circumstances simply do not exist where a plaintiff brings an action based solely on an alleged recollection of events which were repressed from her consciousness and there is no means of independently verifying her allegations in whole or in part. If we applied the discovery rule to such actions, the statute of limitations would be effectively eliminated and its purpose ignored. A person would have an unlimited time to bring an action, while the facts became increasingly difficult to determine. The potential for spurious claims would be great and the probability of the court's determining the truth would be unreasonably low.

■ Given the substantial risks of stale claims in cases of this nature, we conclude that a literal reading of the statutes of limitation strikes the proper balance between the possibility of such claims and the right to bring an action. Under this application of the statutes, the plaintiff had until 3 years beyond the age of majority to bring an action. This provided the plaintiff with a reasonable opportunity to assert a claim while preventing the injustice that would

result if the court had to decide the facts long after the alleged events occurred. We, therefore, hold that the discovery rule does not apply to an intentional tort claim where the plaintiff has blocked the incident from her conscious memory during the period of the statute of limitations.

DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., concur.

GOODLOE, J. (concurring)—I concur with Justice Durham's majority opinion. I believe the arguments of the dissent are most compelling; however, the end result appears to be subjective judicial policy making. This is the exclusive province of the Legislature, and the judiciary must not invade it.

PEARSON, J. (dissenting)—The majority holds that the discovery rule is not applicable to a cause of action for childhood sexual abuse where the adult plaintiff has blocked the abuse from her conscious memory during the entire period of the statute of limitations.

I find the holding and its underlying rationale unsupportable. Although never clearly setting forth a clear rationale, the majority apparently relies on an inaccurate perception of the history, purpose, and prior application of the discovery rule. In addition, the majority indulges in extensive innuendo through which it discredits mental health professionals as expert witnesses. Finally, the majority disregards the enormity of the problem of child sexual abuse, notwithstanding that a grasp of this problem is necessary for resolution of the issue at hand. For these reasons, I dissent.

I

The majority correctly states the discovery rule: "The discovery rule provides that a statute of limitations does not begin to run until the plaintiff, using reasonable diligence, would have discovered the cause of action." Majority opinion, at 75 (citing *U.S. Oil & Ref. Co. v. Department of*

*Ecology,* 96 Wn.2d 85, 92, 633 P.2d 1329 (1981)). The opinion then implies that this court will only apply the rule in cases where "objective, verifiable evidence" is available. Majority opinion, at 77. The majority then apparently concludes that, because there is no "objective, verifiable evidence" of the alleged acts of sexual abuse in this case, the discovery rule is not applicable. This conclusion disregards the history, purpose and prior application of the discovery rule by this court.

We adopted the discovery rule in the landmark case of *Ruth v. Dight,* 75 Wn.2d 660, 453 P.2d 631 (1969). In *Ruth,* we explained the rule. We observed that the rationale behind statutes of limitations was to guard against forcing persons to defend against stale claims. Because such claims rely on old evidence and eroded memories, "compelling one to answer stale claims in the courts is in itself a substantial wrong." *Ruth,* at 665.

Imposition of a statute of limitations generally creates no hardship for plaintiffs because they are aware when they have been wronged. "[W]hen an adult person has a justiciable grievance, he usually knows it and the law affords him ample opportunity to assert it in the courts." *Ruth,* at 665. However, we found that in some instances an injured party may not know or be expected to know he has been injured until long after the statute of limitations has cut off his legal remedy. *Ruth,* at 665. In such instances, it is unfair automatically to foreclose a plaintiff's cause of action.

The decision as to whether it is in fact unfair to foreclose a plaintiff's lawsuit involves a balancing test. The court must balance "the harm of being deprived of a remedy versus the harm of being sued." *Ruth,* at 665.

We balanced these harms in *Ruth* and applied the discovery rule. We found that the harm to a surgical patient of being deprived of a remedy outweighed the harm to the defendant surgeon of being sued 22 years after he performed allegedly negligent surgery. Our result was based on "fundamental fairness". *Ruth,* at 665.

The context in *Ruth* was medical malpractice. However,

in the 17 years following *Ruth,* both this court and the Court of Appeals have extended the discovery rule to other types of professional malpractice. *See, e.g., Kundahl v. Barnett,* 5 Wn. App. 227, 486 P.2d 1164 (1971). We have also applied the rule in cases of libel, *Kittinger v. Boeing Co.,* 21 Wn. App. 484, 585 P.2d 812 (1978); products liability, *see, e.g., Sahlie v. Johns–Manville Sales Corp.,* 99 Wn.2d 550, 663 P.2d 473 (1983); and latent disease, *see, e.g., White v. Johns–Manville Corp.,* 103 Wn.2d 344, 693 P.2d 687 (1985).

As application of the rule has expanded into these varied contexts, its purpose has remained unchanged: it is designed to prevent the injustice which would result from a literal application of the statute of limitations. *Kittinger v. Boeing Co., supra* at 487. In attempting to prevent this injustice, we have never, contrary to the majority's position, required "objective, verifiable evidence" as a prerequisite to application of the rule. Not one of our discovery rule cases has ever imposed such a requirement. Indeed, the nature of available evidence is simply one factor to be considered in balancing the harm to a defendant of being forced to defend a stale claim with the harm to a plaintiff of being deprived of a remedy. Fundamental fairness, not availability of objective evidence, has always been the linchpin of the discovery rule.

The majority's concern with the availability of objective evidence as a prerequisite to application of the discovery rule has led to additional inaccurate reasoning. The majority appears to conclude that because "[t]here is no objective manifestation" of plaintiff's allegation of sexual abuse and because plaintiff's claim "rests on a subjective assertion that wrongful acts occurred and that injuries resulted" (majority opinion, at 77), plaintiff will have difficulty proving her case. Because it will be difficult for her to prove her case, plaintiff should be denied the benefit of the discovery rule. If this is in fact the majority's position, it is unsupportable for several reasons.

The majority's concern is with proof problems. But the

issue here does not involve proof problems at all, but rather the applicability or nonapplicability of the discovery rule. We are simply to decide whether notions of fundamental fairness entitle the plaintiff to try to convince a court or jury that she discovered or should have discovered her cause of action after it would otherwise have been foreclosed by the statute of limitations. The trier of fact determines whether a plaintiff has discovered his or her cause of action within a reasonable time. *Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 514, 598 P.2d 1358 (1979). The evidentiary problems which a plaintiff may encounter in convincing the trier of fact of the reasonableness of her late discovery are not our present concern.

Problems of proof regarding the merits of plaintiff's case are likewise not at issue. Nevertheless, the opinion focuses on the merits. The majority strongly implies that because claims of sexual abuse are difficult to prove and are often without "objective, verifiable evidence", they should not be brought at all. Assuming this is in fact the majority's position, I point out that actions which essentially turn on credibility of the parties are not unique. The trier of fact frequently is asked to determine the outcome of a lawsuit by deciding which party is telling the truth. *See, e.g., Mack v. Mack,* 39 Wash. 190, 81 P. 707 (1905) (action to enforce transfer of mining stock pursuant to an oral agreement); *Cook v. Cook,* 80 Wn.2d 642, 497 P.2d 584 (1972) (action to enforce an asserted oral contract to devise); *Lasser v. Grunbaum Bros. Furniture Co.,* 46 Wn.2d 408, 281 P.2d 832 (1955) (action for damages for breach of an alleged oral contract of employment). It is illogical to foreclose a cause of action alleging sexual abuse just because the parties' credibility will be determinative, when such "swearing contests" are common in other contexts.

In the midst of its concern with proof problems, the majority disregards at least one "swearing contest" in which this court applied the discovery rule: *Gazija v. Nicholas Jerns Co.,* 86 Wn.2d 215, 543 P.2d 338 (1975). In *Gazija,* the plaintiff obtained an insurance policy covering his fish-

ing gear in 1954. The policy was canceled in 1966. The plaintiff's boat sank and his fishing gear was lost in 1970. When the plaintiff made a claim for this loss to his insurer, he learned at that time that the policy had been canceled 4 years earlier. He then brought suit for wrongful cancellation of his policy within the statutory period following discovery of the cancellation.

This court applied the discovery rule and allowed the suit, reasoning that under the facts the plaintiff could not have been expected to know of the cancellation before he submitted a claim. We commented briefly on the merits: "[Defendant] testified that [plaintiff] cancelled the . . . policy and [plaintiff] denies he authorized cancellation. The jury resolved this dispute in favor of [plaintiff]." *Gazija,* at 217.

The *Gazija* court was properly unconcerned with whether the plaintiff lacked "objective, verifiable evidence" of the policy cancellation and could only prove his case if the jury believed his version of events. Instead, the court focused on whether justice and fairness required application of the discovery rule to allow the plaintiff to prove he could not reasonably have discovered his cause of action until the insurer refused to honor the claim. Similarly, this court must now consider only whether justice and fairness mandate that the plaintiff in the instant case deserves the benefit of the discovery rule in order to have an *opportunity* to prevail. The proof problems she must overcome to prove both reasonable discovery and the merits of her case are not at issue.

One final flaw remains with the majority's misconception that discovery rule application requires availability of "objective, verifiable evidence". Under applicable statutes of limitations this plaintiff had until age 20 or 21 to file suit. *See* RCW 4.16.100, 4.16.080, 4.16.190. Here, the acts complained of allegedly occurred from the time plaintiff was 3 years old until she was 11. If plaintiff had filed suit when she was 21, within the statutory period, evidence would have been at least 10 years old at the time of suit.

Plaintiff brought her action, not when she was 21, but when she was 26. Evidence is thus only 5 years older than it would have been if plaintiff had filed at age 21. Even if "objective, verifiable evidence" were an overriding concern in this context, evidence which is now 15 years old rather than 10 years old is not logically so much less "verifiable" that it warrants the harsh result of foreclosing a potentially meritorious claim.

## II

In addition to the majority's faulty discovery rule rationale, I disagree with the majority's denigration of mental health professionals' contribution to our justice system.

The majority states that the trier of fact in legal proceedings cannot assume that testimony by mental health professionals will help the trier to determine the truth. Majority opinion, at 78. Because of the questionable value of testimony by these professionals, "the subjectivity of plaintiff's claim" would not be reduced. Majority opinion, at 78. The majority then apparently concludes that in actions where, as here, mental health professionals may be needed as expert witnesses to assist the trier, such actions should be foreclosed because the unreliability of the experts makes the ascertainment of truth impossible. This position is untenable for the following reasons.

First, the role of psychotherapists as experts where the discovery rule is at issue is to assist the trier in determining time of discovery. As noted above, the trier of fact determines whether a particular plaintiff is entitled to the benefit of the discovery rule. *See Ohler v. Tacoma Gen. Hosp., supra.* Presumably, the "discovery" to be established in the instant case is very recent and may have taken place in sessions between the therapist and plaintiff. To establish the time of discovery, the therapist need not be asked to determine whether incidents in plaintiff's past actually occurred as plaintiff remembered them. In any event, psychotherapists' testimony, as expert testimony, is treated as any other expert testimony. It is merely an aid to the

trier of fact and may be accepted or rejected by the jury. *Gerberg v. Crosby*, 52 Wn.2d 792, 795, 329 P.2d 184 (1958).

Second, the majority based its assertion of the questionable value of testimony by mental health professionals on a single law review article. *See* Wesson, *Historical Truth, Narrative Truth, and Expert Testimony*, 60 Wash. L. Rev. 331 (1985). That article's based premise is that such professionals, as expert witnesses, are not able to chronicle events in a client's past. The article's author herself, however, suggests that any problems which may be created by the mental health professional's inability to substantiate detailed "truth" may be remedied. She recommends three solutions: (1) juries should be instructed that psychotherapists are experts whose testimony may be accepted or rejected; (2) parties should call their own mental health professionals as experts and conduct effective cross examinations; (3) more use should be made of the hypothetical question, which would allow the jury to discern the truth of the premises which underlie the opinion given by the expert. Wesson, 60 Wash. L. Rev. at 351–53. Far from advocating the nonuse of this type of expert testimony, the author identifies some problems and offers solutions. Yet it was this lone article on which the majority rested its premise that the testimony of mental health professionals is inherently unreliable in assisting the trier in the search for truth.

Finally, Washington courts have relied on the expertise of mental health professionals for many years in a wide range of contexts. *See, e.g., Tecklenburg v. Washington Gas & Elec. Co.*, 40 Wn.2d 141, 241 P.2d 1172 (1952) (issue of deceased's incompetence); *In re Young*, 24 Wn. App. 392, 600 P.2d 1312 (1979) (issue of parent's emotional stability in child dependency proceeding); *State v. Kelly*, 102 Wn.2d 188, 685 P.2d 564 (1984) (expert testimony of mental health professionals aids the trier of fact in understanding "battered woman syndrome"); *State v. Eaton,* 30 Wn. App. 288, 633 P.2d 921 (1981) (mental health professionals may give an opinion regarding a defendant's ability to form a specific

intent at the time of a crime). Moreover, the United States Supreme Court has recognized the validity of testimony by mental health professionals. In *Barefoot v. Estelle,* 463 U.S. 880, 77 L. Ed. 2d 1090, 103 S. Ct. 3383 (1983), the Court held that psychiatric testimony regarding a defendant's future dangerousness is admissible for purposes of considering whether to impose the death penalty.

For the majority to imply that we should no longer welcome psychiatric testimony in Washington courtrooms is to suggest that this court "disinvent the wheel". *See Barefoot,* at 896.

### III

Just as I am disturbed by the majority's disregard of the rationale of the discovery rule and criticism of mental health professionals, I am also concerned with the summary manner in which it dismisses the enormous problem of child sexual abuse. A single sentence is offered: "We recognize that child sexual abuse has devastating impacts on the victim." Majority opinion, at 75.

In reality, the problem warrants a great deal of attention. Indeed, some understanding by this court of the nature of child sexual abuse is essential to our determination of the issue before us. We are asked to determine if fundamental fairness compels us to extend the discovery rule to adults who suffered sexual abuse as children and then repressed that abuse. In reaching our decision, we must understand how and why such repression occurs. It is the repression which gives rise to the need for application of the discovery rule.

Although definitions vary, child sexual abuse can be defined as "'contacts or interactions between a child and an adult when the child is being used as an object of gratification for adult sexual needs or desires.'" Note, *Minnesota's Hearsay Exception for Child Victims of Sexual Abuse,* 11 Wm. Mitchell L. Rev. 799, 799 n.1 (1985). It has been estimated that as much as one–third of the population has experienced some form of child sexual abuse. National

Legal Resource Center for Child Advocacy and Protection, *Child Sexual Abuse: Legal Issues and Approaches* (rev. ed. 1981) (citing Landis, *Experiences of 500 Children With Adult Sexual Deviation,* 30 Psych. Q. Supp. 91 (1956)). Much of the sexual abuse of children occurs within the family. Comment, *Statutes of Limitations in Civil Incest Suits: Preserving the Victim's Remedy,* 7 Harv. Women's L.J. 189 (1984). In one study of 583 cases of sexual abuse, the offender was a family member in 47 percent of the cases; otherwise, an acquaintance of the child in 42 percent, and a stranger in only 8 percent. Note, *Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations,* 98 Harv. L. Rev. 806, 807 n.14 (1985). Of this high percentage of cases of abuse among family members, it has been estimated that 75 percent involve incest between father and daughter. Coleman, *Incest: A Proper Definition Reveals the Need for a Different Legal Response,* 49 Mo. L. Rev. 251, 251 n.1 (1984). Both the high incidence of father/daughter incestuous abuse and the special problems of such incest victims have led to much commentary. *See* Comment, *Tort Remedies for Incestuous Abuse,* 13 Golden Gate U. L. Rev. 609 (1983); Comment, *Adult Incest Survivors and the Statute of Limitations: The Delayed Discovery Rule and Long–Term Damages,* 25 Santa Clara L. Rev. 191 (1985). Because incestuous abuse is so pervasive and because the instant case involves father/daughter incest, I have focused on this type of sexual abuse.

Incestuous abuse begins, in the average case, when the daughter is 8 or 9 years old, although sexual relations and even intercourse may begin even earlier. 7 Harv. Women's L.J. at 194–95. In order to ensure his daughter's availability to him and provide a cover for his conduct, the father demands secrecy from the child. Often he frightens her into secrecy with threats of harm. 13 Golden Gate U. L. Rev. at 614–15. Because the victim is thus sworn to secrecy, she is forced to deal with the situation alone. Because she must cope alone, she is likely to internalize her self–blame, anger, fears, confusion, and sadness resulting from the incest. This

internalization results in what has been referred to as "accommodation". 7 Harv. Women's L.J. at 198. In accommodating herself to an intolerable situation, the victim often "blocks out" her experience for many years. Affidavit of Lucy Berliner, social worker (Brief of Plaintiff, at A–2); affidavit of Dr. Gayle Gulick Nelson, psychologist (Brief of Plaintiff, at B–6). This "blocking out" is a coping mechanism. A victim will cope in this fashion because "some things are literally so difficult to deal with if remembered that your choices are to go crazy or to forget them." Affidavit of Dr. Nelson, at B–4.

As the incest victim becomes an adult, she will often begin to exhibit signs of incest trauma. The most common are sexual dysfunction, low self–esteem, poor capacity for self–protection, feelings of isolation, and an inability to form or maintain supportive relationships. 7 Harv. Women's L.J. at 200–01. At this time, the daughter may know she is injured. However, until such time as she is able to place blame for the incestuous abuse upon her father, it will be impossible for her to realize that his behavior caused her psychological disorders. 13 Golden Gate U. L. Rev. at 630. Often it is only through therapy that the victim is able to recognize the causal link between her father's incestuous conduct and her damages from incest trauma. Affidavit of Berliner, at A–2. Once the victim begins to confront her experiences and link her damages with her father's incestuous conduct, she has taken a step as a *survivor* of childhood incestuous abuse.

The need for maturity of the survivor before she can confront her childhood incest experience results in a general lack of ability to file suit within the statutory period. 13 Golden Gate U. L. Rev. at 630. *See also* 25 Santa Clara L. Rev. at 195. As has been seen, the maximum age at which an adult survivor of incest may file suit in this state is 21. Since many survivors are simply incapable of discovering a cause of action by the time they are 21 years old, they are effectively denied a legal remedy unless they are given the benefit of the discovery rule.

## IV

I believe it is unfair to deny adult survivors of childhood sexual abuse a legal remedy. Accordingly, I would reformulate this certified question and answer it in the affirmative. I would hold that the discovery rule, which delays the accrual of a cause of action to the time when a plaintiff discovers or reasonably should have discovered all elements of that cause of action, is applicable to complaints alleging negligence and intentional torts by adult survivors of childhood sexual abuse where the trier of fact finds that the plaintiff has repressed all conscious memory of such abuse during the entire period of the statute of limitations. To hold otherwise is to ignore our 17–year history of application of the discovery rule.

As previously discussed, in considering whether to apply the rule, we balance harm to a defendant of being sued on a stale claim with harm to a plaintiff of being denied a remedy. As we balance these interests, our goal is, and always has been, fundamental fairness. Our cases provide examples of factors which we have expressly recognized as tipping the balance in favor of allowing plaintiffs the benefit of the discovery rule. These factors include: plaintiffs' unawareness that defendants breached a duty owed to them, *see, e.g., Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 598 P.2d 1358 (1979); plaintiffs' trust in defendants, *see, e.g., Kittinger v. Boeing Co.,* 21 Wn. App. 484, 585 P.2d 812 (1978); *Peters v. Simmons,* 87 Wn.2d 400, 552 P.2d 1053 (1976); *Janisch v. Mullins,* 1 Wn. App. 393, 461 P.2d 895 (1969); defendant's sole control over the facts giving rise to plaintiff's cause of action, *see, e.g., U.S. Oil & Ref. Co. v. Department of Ecology,* 96 Wn.2d 85, 633 P.2d 1329 (1981); necessity of some triggering event which makes plaintiff aware of defendant's potential liability, *see, e.g., Gazija v. Nicholas Jerns Co.,* 86 Wn.2d 215, 543 P.2d 338 (1975); *Kittinger v. Boeing Co., supra.* Application of the discovery rule to the instant case is no different in principle from application of the rule in all of these cases.

In *Ohler v. Tacoma Gen. Hosp., supra,* a belated discov-

ery of the defendant's breach of duty was a pivotal factor. In that case, the plaintiff knew she was blinded as a baby in an incubator. However, she did not discover until she became an adult that her blindness was the result of the hospital's breach of duty. There, we held that until a plaintiff has discovered all elements of her cause of action, the statute of limitations does not begin to run. *Ohler,* at 511. Since breach of duty is an essential element of an action for negligence, the statute did not begin to run against the plaintiff in *Ohler* until she discovered the hospital's breach of duty. Similarly, the plaintiff in the instant case knew she had had unwanted sexual contact with her father when she was a child. But she could not know that this contact constituted sexual abuse and that it could cause permanent damage. Not until adulthood, when plaintiff finally confronted the painful events of her childhood, did she realize that this sexual contact was abuse and amounted to breach of her father's duty to her. Under *Ohler,* the statute of limitations should not begin to run against this plaintiff until she discovers, or reasonably should have discovered, breach of duty and all other elements of her cause of action.

Trust was an important factor in the results reached in *Kittinger v. Boeing Co., supra, Peters v. Simmons, supra,* and *Janisch v. Mullins, supra.* The plaintiff in *Kittinger* sued a trusted employee for libel; the plaintiff in *Peters* sued a trusted attorney for the negligent drafting of a business purchase agreement; and the plaintiff in *Janisch* sued a trusted doctor for negligent diagnosis of plaintiff's physical condition. The plaintiffs in those cases had placed a great deal of trust in their respective defendants, and that trust was betrayed. This court in *Peters* and the Court of Appeals in *Kittinger* and *Janisch* focused on breach of trust in deciding that fundamental fairness mandated application of the discovery rule.

The trusting plaintiffs in *Kittinger, Peters* and *Janisch* were adults and the defendants were professionals. If this court and the Court of Appeals found that breach of an adult client's trust by a professional was a deciding factor

in applying the discovery rule in those cases, how can we now ignore breach of a child's trust by a father or other authority figure who exploits the child for sexual gratification?

The fact that only the defendant had full knowledge of its own wrongful acts was important to our decision in *U.S. Oil & Ref. Co. v. Department of Ecology, supra.* There the Department sued the defendant corporation for illegally discharging pollutants. U.S. Oil was in sole control over the facts giving rise to plaintiff's cause of action, in that U.S. Oil knowingly exceeded its effluent limits and submitted inaccurate monitoring reports. Throughout the statutory period, only U.S. Oil had full knowledge that it had engaged in wrongful activity. The Department did not know and could not have known of U.S. Oil's illegal acts. Similarly, it is the sexual abusers of children who have full knowledge, throughout the statutory period, that their actions constituted sexual abuse. The victims, as children, could not have had full knowledge of the wrongfulness of their abusers' acts and, in particular, the permanent damages that result. To deny the opportunity to obtain a remedy to adult survivors of this abuse, and at the same time allow abusers to escape liability while they always had full knowledge of the abuse, is to ignore the rationale in *U.S. Oil.*

Finally, this court has previously found that a "triggering event" may sometimes be necessary to arouse a plaintiff's suspicions regarding a defendant's potential liability. In *Gazija v. Nicholas Jerns Co., supra,* the plaintiff insured was unaware throughout the entire statutory period that his insurance policy had been wrongfully canceled. It was not until the triggering event of the company's refusal to pay a claim that the insured realized he had a cause of action. Similarly, plaintiffs who are adult survivors of childhood sexual abuse typically come to an awareness of all elements of their cause of action long after the wrongful acts were committed. A triggering event, such as psychotherapy, is often necessary to help bring these survivors to

an awareness of their abusers' potential liability.

I believe that consistency with these prior applications of the discovery rule requires extension of the rule to adult survivors of childhood sexual abuse who bring actions against their alleged abusers. It should be emphasized that such plaintiffs are not guaranteed success, notwithstanding a decision to apply the rule. In the first place, these plaintiffs, like other personal injury plaintiffs, must prove all elements of their cause of action. Here, to prevail on the merits, this plaintiff must show that she has suffered injury, that such injury was the result of childhood sexual abuse, and that defendant was her abuser.

In addition, plaintiff must convince the trier of fact that application of the discovery rule is warranted in her particular case. To convince the trier, plaintiff must prove that all elements of her cause of action were not only not discovered earlier, but that such actions could not reasonably have been discovered earlier. Failure to prove discovery occurred at a reasonable time will foreclose a remedy. Indeed, in many instances plaintiffs who have the theoretical benefit of the discovery rule have been unable to prove they are entitled to it. *See, e.g., Sidney–Vinstein v. A.H. Robins Co.,* 697 F.2d 880 (9th Cir. 1983) (where plaintiff was told 6 years before she filed suit that her intrauterine device caused her perforated uterus, the discovery rule was not applicable); *Steele v. Organon, Inc.,* 43 Wn. App. 230, 716 P.2d 920 (1986) (discovery rule not applicable where plaintiff knew 9 years prior to filing suit that the product in question caused her heart attack and stroke); *Reichelt v. Johns–Manville Corp.,* 42 Wn. App. 620, 712 P.2d 881 (1986) (plaintiff shipyard worker, suffering from asbestosis, was time barred because he failed to file suit within the 3–year statutory period after discovering all elements of his cause of action).

The purpose behind extending the discovery rule to adult survivors of childhood sexual abuse is not to provide a guaranteed remedy to such plaintiffs. The purpose is to provide an *opportunity* for an adult who claims to have

been sexually abused as a child to prove not only that she was abused and that the defendant was her abuser, but that her suffering was such that she did not and could not reasonably have discovered all the elements of her cause of action at an earlier time. The policy behind providing this opportunity has been demonstrated: the nature of child sexual abuse, according to extensive expert commentary, is often so secretive, so humiliating, and so devastating that a victim typically represses the events until the abuse is "discovered"—often through psychotherapy, and often well into adulthood.

For these reasons, I dissent. I would hold that the discovery rule is applicable to complaints alleging negligent and intentional torts by survivors of childhood sexual abuse.

DOLLIVER, C.J., and UTTER and BRACHTENBACH, JJ., concur with PEARSON, J.

UTTER, J. (concurring in the dissent)—I agree fully with the well reasoned opinion of Justice Pearson. I write separately to emphasize that the extension of the discovery rule urged by Nancy Tyson is not an issue that should be left to the Legislature. To do so rejects the reasoning adopted by this court in *Wyman v. Wallace,* 94 Wn.2d 99, 615 P.2d 452 (1980). It is important for this court to adjust tort law doctrine in response to changes in social values and knowledge. Judicial action is especially appropriate when taken on behalf of individuals who are not organized as a political force and who cannot produce legislative solutions to their problems.

In *Wyman v. Wallace, supra,* we decided that this court does not need to wait for legislative action on matters of common law tort doctrine. We noted in that case that deference to the Legislature is appropriate in some fields; for example, the Legislature is particularly well suited to conduct the fact–finding necessary for economic legislation. *See, e.g., Aetna Life Ins. Co. v. Washington Life & Disab.*

*Ins. Guar. Ass'n,* 83 Wn.2d 523, 534, 520 P.2d 162 (1974). However, we concluded that because of its own institutional restraints the Legislature is not always in the best position to modify common law tort doctrine. 94 Wn.2d at 101.

This court also has refused to wait for legislative action with respect to application of the statutes of limitations. Although statutes of limitations establish time periods for the commencement of actions, the statutes generally do not establish the point at which the time periods begin to run. *See, e.g.,* RCW 4.16.180, 4.16.100, 4.16.130. Instead, the statutes state that claims run from the time that the cause of action "accrues"—"a term susceptible of interpretation from its very nature." *Ruth v. Dight,* 75 Wn.2d 660, 666, 453 P.2d 631 (1969); *see, e.g.,* RCW 4.16.130. In 1969 this court concluded that because the Legislature had not spoken definitively on the situation in which an individual learns of medical malpractice only after the statute of limitations has run, "[t]he problem thus remains with the judiciary, for . . . the courts, as instruments of the common law and in furtherance of this traditional role to prevent injustice, should try to strike . . . a balance." *Ruth v. Dight,* 75 Wn.2d at 665. Under our precedents it is thus within the province of this court to extend the discovery rule to the case of Nancy Tyson.

Increased knowledge and increased public awareness have produced the issue before us. Child abuse has attracted significant attention only since 1962, when the "battered child syndrome" was first defined. Public and professional attention have been directed toward child sexual abuse—incest in particular—for an even shorter period of time. Comment, *Statutes of Limitations in Civil Incest Suits: Preserving the Victim's Remedy,* 7 Harv. Women's L.J. 189, 192–93 (1984). In fact, mental health therapists and other professionals largely denied the prevalence of incestuous abuse until the 1970's. 7 Harv. Women's L.J., at 192. It is only in the past decade or so that professionals have documented the damages of incestuous abuse and the "blocking out" that the trauma of the abuse can cause.

96

96

This court cannot rely on the Legislature to extend the discovery rule in response to these recent developments. Legislatures rarely reexamine tort law in light of recent changes. Peck, *The Role of the Courts and Legislatures in the Reform of Tort Law*, 48 Minn. L. Rev. 265, 268–70 (1963). Legislators consider so many issues in so little time that only the most compelling needs can be addressed. Peck, 48 Minn. L. Rev. at 270–75.

This court also cannot rely on tort victims to bring issues of tort reform to the attention of the Legislature. Tort victims do not constitute a well organized lobbying group. They are not brought together by a common interest in legislation addressed to the future; instead, each plaintiff usually simply desires redress for past injuries. Peck, *Comments on Judicial Creativity*, 69 Iowa L. Rev. 1, 13 (1983).

In this case, especially, we can hardly expect Nancy Tyson to evoke a response from the Legislature. An adult survivor of child sexual abuse cannot elicit the same public support as a child victim. Survivors with experiences similar to those of Nancy may well be reluctant to reveal their painful experiences by lobbying and testifying at legislative hearings. The public agencies and private groups that represent these individuals do not have the resources to launch such a campaign.

In the past this court has been unafraid to change tort law in response to modern developments. In *Freehe v. Freehe*, 81 Wn.2d 183, 500 P.2 771 (1972), for example, we abolished the traditional immunity between spouses because of our conclusion that "[m]odern realities do not comport with the traditional 'supposed unity' of husband and wife." 81 Wn.2d at 187. In *Hunsley v. Giard*, 87 Wn.2d 424, 553 P.2d 1096 (1976), we acknowledged societal acceptance of emotional distress as an injury in and of itself with the comment that "[t]he old rationales are simply no longer viable". 87 Wn.2d at 433.

This court should not hesitate to apply the discovery rule on behalf of adult survivors of child sexual abuse who have repressed their memories during the period of the statute of

limitations. "[F]lexibility is necessary to enable the law to adapt itself to social change. As a society alters, so do its needs, and a serviceable legal system must be able in its development to take account of new social, political and economic requirements." (Footnote omitted.) J. Salmond, *Jurisprudence* 65 (12th ed. 1966). It is particularly appropriate for this court to take action on behalf of a group that cannot obtain representation in the political process. Peck, 69 Iowa L. Rev. at 45.

For these reasons I concur in the dissenting opinion.

DOLLIVER, C.J., and PEARSON, J., concur with UTTER, J.

Reconsideration denied January 6, 1987.